Slip Op. 16 - 29

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CATFISH FARMERS OF AMERICA, *et al.*, | :<br>:<br>: |
| Plaintiffs, | :<br>: |
| v. | : Before: R. Kenton Musgrave, Senior Judge<br>: |
| UNITED STATES, | : Consol. Court No. 12-00087<br>: |
| Defendant, | :<br>: |
| and | :<br>: |
| VINH HOAN CORP., QVD FOOD CO., LTD., VIETNAM ASSOCIATION OF SEAFOOD EXPORTERS AND PRODUCERS, ANVIFISH JOINT STOCK CO., BIEN DONG SEAFOOD CO., LTD., and VINH QUANG FISHERIES CORP., | :<br>:<br>:<br>:<br>:<br>:<br>: |
| Defendant-Intervenors. | : |

**OPINION**

[Sustaining final results of redetermination of seventh administrative review of frozen fish fillets from the Socialist Republic of Vietnam.]

Decided: March 30, 2016

*James R. Cannon, Jr.*, *Jonathan Mario Zielinski*, *Nazak Nikakhtar*, and *Nathaniel J. Halvorson*, Cassidy Levy Kent (USA) LLP, of Washington D.C., for the plaintiffs. On the initial comments were also *Valerie A. Slater* and *Dallas Woodrum*, Akin Gump Strauss Hauer & Feld LLP, of Washington D.C.

*Ryan M. Majerus*, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., argued for the defendant. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of Counsel on the brief was *Elika Eftekhari*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

*Matthew J. McConkey*, Mayer Brown LLP, of Washington D.C., for defendant-intervenors Vinh Hoan Corporation and QVD Food Company, Ltd.

*Andrew B. Schroth, Mark E. Pardo,* and *Andrew T. Schutz*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington D.C., for defendant-intervenor Vietnam Association of Seafood Exporters and Producers.

*Robert G. Gosselink* and *Jonathan M. Freed*, Trade Pacific, PLLC, of Washington D.C., for defendant-intervenors Anvifish Joint Stock Company, Bien Dong Seafood Company Ltd., and Vinh Quang Fisheries Corporation.

Musgrave, Senior Judge: Before the court are the Final Results of Redetermination[1] on the seventh administrative review of the antidumping duty order covering certain frozen fish fillets from the Socialist Republic of Vietnam.[2] The plaintiffs[3] and a defendant-intervenor, Vinh Hoan Corporation ("Vinh Hoan"), continue to challenge several aspects of the Remand Results. Familiarity with the case is presumed. The court finds Commerce's Remand Results supported by substantial evidence on the record.

---

[1] Final Results of Redetermination Pursuant to Court Order (June 29, 2015), ECF No. 92 ("Remand Results"), filed by the defendant's U.S. Department of Commerce, International Trade Administration ("Commerce" or "defendant") pursuant to *Catfish Farmers of America v. United States*, 38 CIT ___, Slip Op. 14-146 (Dec. 18, 2014) ("*Catfish Farmers I*").

[2] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results and Partial Rescission of the Seventh Antidumping Duty Administrative Review*, 77 Fed. Reg. 15039 (Mar. 14, 2012), PDoc-II-129 ("*Final Results*"), and accompanying issues and decision memorandum, PDoc-I-112 ("IDM"). The period of review ("POR") covers August 1, 2009 through July 31, 2010.

[3] Catfish Farmers of America, America's Catch, Alabama Catfish Inc., d/b/a Harvest Select Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc., d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. ("Catfish Farmers" or "plaintiffs").

*Background*

To summarize briefly, *Catfish Farmers I* remanded the *Final Results* to Commerce to further explain, *inter alia*, Commerce's determination that the Bangladeshi Department of Agricultural Marketing ("DAM") data are the "best available information" for valuing the whole live fish input in light of the plaintiffs' concerns regarding (1) the DAM data's reliability and (2) their commercial quantities, and (3) Commerce's surrogate value by-product calculations for fish waste, fresh broken fillets, frozen broken fillets and fish oil. *See Catfish Farmers I.* On remand, Commerce considered these and other issues, ultimately continuing to determine the DAM data are reliable and constitute the best available information. Remand Results at 2-12, 16-25; Defendant's Response to Plaintiffs' and Defendant-Intervenors's Comments on the Final Remand Redetermination (Jan. 6, 2016), ECF No. 121 ("Def.'s Resp."), 6-15. Commerce also determined different surrogate values for each challenged by-product.

*Discussion*

The plaintiffs assert that Commerce's Remand Results are not supported by substantial evidence and otherwise not in accordance with law because (1) the DAM data are not specific to the main production input of whole live fish, and (2) the DAM data are otherwise not reliable. Plaintiff's Comments on Defendant's Remand Determination (Aug. 12, 2015) (Public Version), ECF No. 99 ("Pls' Cmts"). Defendant-intervenor Vinh Hoan challenges Commerce's fish oil by-product surrogate value ("SV"), claiming that imposing a cap on the price is not supported by the record and that the calculated cap incorporates serious errors. Defendant-Intervernor's Comments on the Final Redetermination Pursuant to Remand (Aug. 12, 2015), ECF No. 97 ("Def-

Int's Cmts"); s*ee also* Plaintiff's Response to Defendant-Intervenor's Comments on the Remand Results (Oct. 9, 2014), ECF No. 114 ("Pls' Resp.").

I

The plaintiffs contend that Commerce's Remand Results are not supported by substantial evidence because the pricing data used to value the main production input of whole live fish (the DAM data) are not specific to the input in question and are not reliable. The plaintiffs' central argument regarding specificity is that because the DAM data reference wholesale price data and not farm-gate price data, they represent prices for "dead or sluggish" fish and are therefore not specific to whole live fish. Pls' Cmts at 2-11. The plaintiffs' contention against the reliability of the DAM data centers on previously-raised concerns regarding the lack of data validation by the DAM and the overlap between the DAM's "worksheet" data and its derivative "website" data.[4] *Id*. at 11-23. These arguments do not persuade the court that Commerce's determination is unsupported by substantial evidence on the record.

A

The plaintiffs assert that the DAM data are not specific because the data refer to "dead or sluggish" fish and not whole live fish. They contend that, as a result, using the DAM data results in a "less accurate" SV because the record demonstrates that the respondents' production consumes whole live fish and does not consume dead fish. To support their position, the plaintiffs

---

[4] Defendant-intervenor Vietnam Association of Seafood Exporters and Producers ("VASEP") originally placed the worksheet data on the record. VASEP's SV Submission (May 10, 2011) PDoc-I-100 at Ex. 13. Subsequently, VASEP placed the website data on the record. VASEP's Submission of Factual Data -- Bangladesh DAM Pricing Data Published on Government Internet Website (Dec. 22, 2011), PDoc-II-70 at Exs. 1-20.

rely on one affidavit from Bangladeshi counsel retained by the plaintiffs in this matter recounting interviews with certain DAM officials who aver that the DAM data include prices for dead fish. Pls' Cmts at 9, referencing Petitioners' July 25, 2011 Rebuttal SV Information Submission, PDoc-I-124 at Ex. 1. The affidavit avers that DAM officials stated during an interview that "fish are dead when sold at the [wholesale] market" and that the DAM data reference dead fish. *Id*. The plaintiffs further argue that because significant distinctions exist at the farm-gate and wholesale production levels that result in distorted prices, Commerce's determination to use wholesale price data provided by the DAM is legally unsustainable. The plaintiffs emphasize the relevant distinctions of the "condition" of farm-gate and wholesale fish: (1) that the fish are live when sold at the farm-gate and dead at the wholesale market, and (2) that farm-gate sales represent live fish at "an earlier point of sale" and the wholesale sales represent live fish at a "more downstream point of sale." Pls' Cmts at 4.

On the threshold issue of whether the DAM data reflect prices of live or dead fish, Commerce does not assert that respondents purchase dead or sluggish fish. Instead, Commerce argues that the data are specific to whole live fish because they only reference prices for "live fish". Commerce relies on an official letter from the DAM averring that the DAM data refer to prices for "whole live fish". Remand Results at 19, referencing VASEP's SV Submission (May 10, 2011), PDoc-I-100 at Exs. 13B & C.

Under the relevant standards of review, the court must uphold Commerce's determination, finding, or decision unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i). Where Commerce has the choice between two fairly conflicting views, "[t]he court may not substitute its judgment for that of

the [agency] . . . even though the court would have justifiably made a different choice had the matter been before it *de novo*." *Timken Co. v. United States*, 26 CIT 590, 592, 209 F. Supp. 2d 1373, 1375 (2002) ("*Timken*"), quoting *Universal Camera v. NLRB*, 340 U.S. 474, 488 (1951) (internal citations and quotations omitted). Moreover, "the possibility of drawing two inconsistent conclusions from the evidence . . . does not mean that an agency's finding is not supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1996) (internal citations omitted). Finally, where substantial evidence exists on both sides of an issue, "the statutory substantial evidence standard compels deference to the [agency]." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1354 (Fed. Cir. 2006).

The two pieces of evidence relied upon by Commerce and the plaintiffs are facially contradictory. Where Commerce has conflicting evidence on the record and substantial evidence exists on both sides of an issue, the standard compels deference to Commerce, provided Commerce has reasonably explained its determination. Here, Commerce explained that it has "determine[d] that official government documentation . . . [is] more reliable than an unofficial document procured by interested parties' counsel[ ] about a conversation with Bangladeshi officials held for purposes of the underlying proceeding". Def's Resp. at 10; Remand Results at 19. The court cannot re-weigh the record evidence, nor can it substitute its own judgment on this issue, *Timken*, 26 CIT at 592, and further it is not persuaded that Commerce's decision to place more weight on the official DAM documentation was unreasonable. Therefore, the court finds Commerce's determination that the DAM data reference whole "live" fish prices supported by substantial evidence.

B

As to the issue of whether the DAM data are specific, Commerce does not dispute that the respondents procure their fish input from farms; rather, it disputes the plaintiffs' "contention that prices labeled as being at the farm-gate level . . . are comprehensively superior to other SV data." Remand Results at 18-19. Commerce further explains that on this record, there is not enough detail to conclude that qualitative distinctions would bear upon the other SV criteria because (1) respondents' purchasing experiences differ, (2) any presumed differences between farm-gate and wholesale fish are mitigated by the perishable nature of the fish, and, importantly, (3) the underlying record lacks detail. Remand Results at 6-7 ("nothing in the record indicates a more accurate result would be achieved in this case by using prices identified as farm-gate (BAS data) instead of those which are wholesale (DAM data)" to value respondents' live fish); Def's Resp. at 10-11.

The plaintiffs reiterate their arguments that (1) the respondents do not consume dead fish in their production processes, (2) product specificity is the most important factor[5], (3) to the extent the DAM data reflect values for "live" fish, such fish will be "sluggish", and (4) the fact that the DAM wholesale data include values for dead or sluggish fish results in a "less accurate" result to value the respondents' whole live fish input. However, as the defendant responds, *on this record* nothing indicates that a more "accurate" (in terms of price differential) result would be achieved in this case by using prices identified as farm-gate (the BAS data) instead of those that are wholesale

---

[5] *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) ("[t]he record further supports Commerce's conclusion that garlic bulb size is a more important factor than contemporaneity"). Notwithstanding such and similar intimation, the weight Commerce accords to each factor is within its discretion and dependent, *ad hoc*, on the record of a given proceeding and situation.

(the DAM data) in order to value the respondents' live fish. *See* Remand Results at 6; *see also* IDM at cmt 1.C. In other words, the plaintiffs' argument does not demonstrate that, on this record, using farm-gate price data instead of wholesale price data will result in a distorted SV for the whole live fish input. "Dead or sluggish fish" may be "less accurate" from a product specificity standpoint, but the bottom line (as always) is concerned with price. The court's clearly expressed concern previously was with respect to the inadvertent introduction of pricing distortions through the selection of wholesale data rather than farm-gate data; however, the plaintiffs' comments and arguments on the Remand Results do not demonstrate, on this record and at this point, that a meaningful price differential will result. The court therefore is not persuaded that Commerce's determination is unsupported by substantial evidence on this record.

II

As to reliability, on remand Commerce was directed to further explain its determination in light of: the discrepancies between the worksheet and website datasets; the DAM's non-responsiveness to Commerce's requests for information; and the plaintiffs' concern that the DAM data do not represent commercial quantities. *Catfish Farmers 1*, 11-14. The court finds Commerce's determination that the DAM data[6] are reliable to be reasonable and supported by substantial evidence on the record.

---

[6] As explained by Commerce in its *Final Results* and Remand Results, Commerce relies solely on the DAM website data in its determinations. *See* IDM at cmt 1.C ("Given that we continue to find the DAM [worksheets] not to be publicly available, we will now consider only the partial DAM data published online by the Bangladeshi government.")

A

In the Remand Results, Commerce explains that it considers the DAM data to reflect commercial quantities given the record evidence. Specifically, Commerce explains that the discrepancies between the two DAM datasets are not informative because it no longer "accord[s] weight" to the worksheets and that public availability concerns "became moot" with the public availability of the website data, and it emphasizes that the DAM's failure to respond to Commerce's questions is not meaningful because it submitted the questions with regard to the worksheet data, not the website data, and its questions to the DAM primarily centered on the issue of public availability. Commerce further notes that even if it did afford any weight to the worksheets, the average discrepancy is "about 3 percent, meaning there is no meaningful difference when taken together as a whole." Remand Results at 8; *see also* Def's Resp. at 11-12.

As to whether the DAM data reflects commercial quantities, the plaintiffs argue that Commerce had no basis to make such a finding in the absence of quantity or volume information associated with the DAM data. Pls' Cmts at 20-23. The plaintiffs particularly take issue with Commerce's reliance on the *Fisheries Statistical Yearbook of Bangladesh* to corroborate the DAM data, arguing that the reported volume of fish sold nationally cannot serve as a proxy for the volume of fish actually represented by the DAM data. *See* VASEP's SV Submission (Nov. 15, 2011), PDoc-II-43 at Ex. 5D (Table 18) ("*Yearbook*"). The plaintiffs also argue that Commerce's treatment of the DAM's price observations in the previous review undermine Commerce's argument here, suggesting that because the DAM prices are reported on a "per quintal basis", or 100 kilogram lot basis, "the DAM's 766 website price observations could at most account for . . . 76.6 metric tons" during the POR. Pls' Cmts at 22. Continuing on this point, the plaintiffs contrast the DAM data

with the BAS and FIGIS data[7] on the record, explaining that those sources have volume data associated with price data representing 83 metric tons ("MT") and 109,865 MT.

The defendant explains that the lack of volume data does not rule out or heavily weigh against the use of such price information, given the available record evidence. Commerce found that the record demonstrates significant production of 124,760 metric tons of *Pangasius* in Bangladesh in and around the POR. Remand Results at 8-9, referencing VASEP's SV Submission (Nov. 15, 2011), PDoc-II-43 at Ex. 5D (Table 18). The defendant argues that Commerce drew a reasonable inference regarding the DAM data and the *Yearbook* data, finding that given the scope, coverage, and frequency of data collection by the DAM for the POR and the "systematic, national-level price monitoring specific to the *Pangasius* species at issue . . . collected by a government agency and maintained on a regular basis", the DAM data represent commercial quantities. Def's Resp. at 13. Commerce also cites other reviews in which it relied on sources for major inputs that do not contain specific volume or value data used to establish the prices.[8] Similarly to its decisions in those cases, Commerce here found that based on the record as a whole, the DAM data reflect commercial quantities even in the absence of volume information.

---

[7] These two sources were considered by Commerce for the *Final Results* alongside the DAM data: (1) *Fisheries Statistics of the Philippines* 2007-2009, an official government publication of the Philippine Government's Bureau of Agricultural Statistics ("BAS"), Fisheries Statistics Division, containing 2009 *Pangasius* prices; and (2) price and quantity data for 2009 for *Pangasius* pertaining to Indonesia from the U.N. Food and Agricultural Organization's Fisheries Global Information System ("FIGIS").

[8] See *Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 33977 (June 16, 2008) ("*Nails*") and accompanying IDM at cmt 10; *see also Steel Wire Garment Hangers from the People's Republic of China: Final Determination of Sales at Less than Fair Value*, 73 Fed. Reg. 47587 (Aug. 14, 2008) ("*Hangers*") and accompanying IDM at cmt 4.

Commerce has broad discretion to determine the best available information for an antidumping review, as the term "best available information" is not defined by statute. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1322 (Fed. Cir. 2010); *see Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (Commerce is afforded "wide discretion" to value factors of production in nonmarket economies). Commerce cannot base its analysis on mere speculation, but may draw reasonable inferences from the record. *Lifestyle Enterprise, Inc. v. United States*, 35 CIT ___, ___, 768 F. Supp. 2d 1286, 1309 (2011), referencing *Hebei Metals & Minerals Imp. & Exp. v. United States*, 28 CIT 1185, 1203, 366 F. Supp. 2d 1264, 1277 n.7 (2004). The court's inquiry "takes into account the entire record, which includes evidence that supports and detracts from the conclusion reached." *Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1362 (Fed. Cir. 2009).

The court disagrees with the plaintiffs' interpretation of the "per quintal basis" price reports. The defendant correctly observes that this line of reasoning requires the unlikely assumption that reporting districts only sold one quintal (100 kg) of fish per week. While Commerce may have overstated the upper level limit by positing that the data may reflect "hundreds or thousands" of quintals, Commerce has made a reasonable inference that 76.6 MT is a "lower level volume cap" on the volume of sale reflected in the DAM data and not an absolute upper level volume cap as suggested by the plaintiffs. Further, the plaintiffs' questionable assertion that the DAM data "at most" reflect only 76.6 MT is undermined by the data the plaintiffs offer in the DAM data's stead. The BAS data reflect a volume of 83 MT; even assuming, *arguendo*, the plaintiffs' argument regarding the total production volume represented by the DAM data, the slightly higher total production volume represented by the BAS data is not a compelling reason for finding

Consol. Court No. 12-00087                                                                                                  Page 12

Commerce's acceptance of the DAM data over the BAS data unreasonable. The BAS and FIGIS data suffer from other flaws, and Commerce deemed them deficient as compared with the DAM data.

The plaintiffs also misrepresent Commerce's use of the *Yearbook*. Commerce does not assert the *Yearbook* as a proxy; instead, Commerce explains, the *Yearbook* evidence demonstrates that the Bangladeshi *Pangasius* industry is mature and not insignificant. Remand Results at 8-9, 24. Commerce's inference that the DAM data represent commercial quantities because the DAM data represent 767 price observations in 31 of 68 districts (including Mymensing, the largest *Pangasius*-producing district in Bangladesh) of a country producing 124,760 MT of *Pangasius* during the POR is reasonable given the record evidence taken as a whole. *See Lifestyle Enterprise, Inc.*, 768 F. Supp. 2d at 1309 (Commerce may draw reasonable inferences from the record). Moreover, the plaintiffs appear to take no issue with Commerce's reliance on previous reviews of *Nails* and *Hangers*, where volume data was not included with the price data but the dataset was nonetheless found to be indicative of a broad market average.

Considering the foregoing, the plaintiffs' arguments do not persuade that Commerce's finding with respect to commercial quantities is not supported by substantial evidence or not in accordance with law.

B

As previously observed, *see Catfish Farmers I* at 8-14, notwithstanding that the DAM failed to respond to Commerce's requests, the defendant in its *Final Results* concluded that the

DAM website provided a "robust" set of *Pangasius* prices in Bangladesh and were reliable for SV purposes. *Final Results* at 13. The matter was remanded for further explanation. The plaintiffs at this point assert that the defendant's Remand Results do not comply with the court's explicit instructions to reconsider the "non-responsiveness" of the DAM. As detailed below, Commerce asserts that the DAM's failure to respond to its questions does not form the basis for its reasoning in its SV analysis. The court finds that Commerce's explanation complies with the remand order in *Catfish Farmers I*, and that Commerce's determination on the issue of reliability is supported by substantial evidence on the record.

Regarding the reliability of the DAM data, the plaintiffs reiterate that they provided affidavits from two Bangladeshi farmers and one from local counsel, which averred that the DAM data were not gathered based on any statistical sampling technique (valid or otherwise), nor were they gathered using "structured questionnaires", as well as a second affidavit from counsel that averred there was no DAM process during the POR to validate the prices the DAM collects from the wholesale markets. Pls' Cmts at 11-12, referencing Petitioners' SV Rebuttal Submission (June 3, 2011), PDoc-I-109 at Exs. 5-7 and Petitioners' SV Rebuttal Submission (July 25, 2011), PDoc-I-124 at Ex. 1, para. 5. The plaintiffs also claim they submitted an "independent report" not prepared for this proceeding or at the plaintiffs' request that surveyed the quality of the aquaculture data collected and published by DAM and concluded that the DAM's market prices are "not up-to-date and in many cases not reliable." Pls' Cmts at 12, referencing Petitioners' Rebuttal SV Submission (Jan. 6, 2012), PDoc-II-76 at Ex. 2. The plaintiff emphasize, more importantly, that the defendant issued to the DAM letters containing questions about the manner in which the agency collected, analyzed and disseminated wholesale prices for *Pangasius* fish, but that the DAM,

significantly, failed to respond to either of the defendant's letters requesting that information. IDM at cmt 1.

According to the defendant, the focus of its questions to the DAM rested on the "public availability of the [DAM] worksheets" and so were not probative of the overall reliability of the DAM website data. Remand Results at 7 & 20. The defendant agrees with the plaintiffs that the questions it sent to the DAM "did not only pertain to public availability", but states that public availability was a "significant reason" for sending the information requests to the DAM. In the preliminary results, Commerce based its decision not to use the DAM data primarily on its finding that the DAM worksheet data were not publicly available, despite having found that the DAM worksheet data satisfied the other SV criteria. *See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Preliminary Results and Partial Rescission of the Seventh Antidumping Duty Administrative Review*, 76 Fed. Reg. 55872, 55876-77 (Sept. 9, 2011) ("[a]s a result of the uncertainty regarding public availability of the DAM [worksheet] data, we find that Bangladesh does not provide the best available information with respect to valuation of whole live fish for purposes of the preliminary results"). In the *Final Results*, Commerce's concerns regarding public availability were resolved because the DAM website data placed on the record were publicly available. IDM at cmt 1.C. Commerce therefore determined that because the DAM website data were species-specific, represent a broad market average, contemporaneous with the POR, from an approved surrogate country, tax- and duty-exclusive, and publicly available, these data were the best available information on this record for valuing the whole fish input. *Id.*; *see* Remand Results at 3-4, 7-10.

The plaintiffs argue that because the DAM did not respond to Commerce's other questions regarding data validation and reliability, the DAM data cannot represent the best available

Consol. Court No. 12-00087                                                                                      Page 15

information. Despite the court's continued concerns on this point, the plaintiffs do not persuade that further remand will be fruitful. Commerce must value the factors of production "based on the best available information regarding the values of such factors". 19 U.S.C. §1677b(c)(1). Commerce found flaws with each of the datasets placed on the record from which to value whole live fish. Commerce found the BAS data specific to the species and publicly available, but less contemporaneous than the DAM data and less representative of a broad market average. IDM at cmt 1.C. Commerce similarly found the FIGIS data less contemporaneous than the DAM data and less specific than the DAM data, as the FIGIS data include prices for one species of *Pangasius* not covered by the antidumping duty order whereas the DAM data are specific to *Pangasius hypothalamus*, the species specific to the respondents' input. *See id.* at 1.B & C.

"When all the available information is flawed in some way, Commerce must make a judgment call as to what constitutes the 'best' information." *Lifestyle Enterprise, Inc. v. United States*, 751 F.3d 1371, 1378 (Fed. Cir. 2014). Despite the DAM's non-responsiveness to Commerce's requests for information, Commerce found that, on this record, the DAM website data satisfy its criteria for selecting the best available information, and that the DAM website data are a "more robust data source . . . especially with respect to specificity and contemporaneity" than the BAS or FIGIS data. IDM at cmt 1.C. While the court may have concerns regarding the non-responsiveness of the DAM and the verification of the DAM website data, as pointed out by the plaintiffs, it cannot substitute its own judgment for that of Commerce. *Timken*, 26 CIT at 592. Commerce determined that the DAM website data satisfy its criteria and that the DAM data were superior to the other data sources on the record. The court finds this determination supported by substantial evidence.

III

On remand, Commerce determined different by-product SVs for fish waste, fresh broken fillets, frozen broken fillets, and fish oil. Remand Results at 12-16. Commerce notes that there appear to be no challenges to the SVs for fish waste, fresh broken fillets and frozen broken fillets. Def's Resp. at 21; *see generally* Pls' Cmts, Def-Int's Cmts, and Pls' Resp.

For the fish oil SV, Commerce considered an Indonesian supplier price quote proffered by the plaintiffs, but ultimately found that the price quote was not the best available information because it did not meet the selection criterion for contemporaneity and appeared to be an unofficial price quote with no indication on the record that it reflected a market price. Remand Results at 15. Commerce therefore continued to value the fish oil by-product using the Indonesian Global Trade Atlas ("GTA") GTA import statistics data for Harmonized Tariff Schedule ("HTS") subheading 1504.20.90.00,[9] but capped (*i.e.* applied a ceiling to) the price at the calculated value of the FOPs and ratios used by Vinh Hoan to make fish oil in order to ensure that the value was "fully loaded".[10] Def's Resp. at 17-18; *see also* Remand Results at 15. Respondent Vinh Hoan challenges this SV determination as unsupported by substantial evidence.

However, in the *Final Results* and again in the Remand Results, Commerce determined that Vinh Hoan had a dumping margin of 0.00%, thus *de minimis* under 19 C.F.R. § 351.106(c)(2). *Final Result,* 77 Fed. Reg. at 88579; Remand Results at 29. Even if Vinh Hoan is

---

[9] HTS 1504.20.90.00 covers "Fish Fats & Oils & Their Fractions Exc Liver, Refined Or Not, Not Chemically Mod, Solid Fractions, Not Chemically Mod, Other".

[10] Commerce explains that "fully loaded" here means "a value that accounts for the total sum of the value-added from converting fish waste/scrap to fish oil by including processing costs, overhead, selling and general administrative expenses (SG&A), and profit." Def's Resp. at 18.

correct in its assertions against the defendant, a remand here would have no effect on Vinh Hoan's margin. As summarized in *Allegheny Ludlum Corp. v. United States*:

> The Supreme Court thus requires application of a two-part test to determine whether a case is ripe for judicial action. First, the court must determine whether the issues are fit for judicial decision -- that is, whether there is a present case or controversy between the parties, *see Lake Carriers' Ass'n v. MacMullen*, 406 U.S. 498, 502 (1972); *BP Chems Ltd. v. Union Carbide Corp.*, 4 F.3d 957, 977 (Fed. Cir. 1993); and second, whether there is sufficient risk of immediate hardship to warrant prompt adjudication -- that is, whether withholding judicial decision would work undue hardship on the parties, *MacMullen*, 406 U.S. at 506; *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 200-01 (1983). Both prongs must be satisfied before an Article III court may apply its adjudicative powers to a case's merits.

*Allegheny Ludlum Corp. v. United States*, 24 CIT 1424, 1448-49, 215 F. Supp. 2d 1322, 1344 (2000) (internal quotes and citations omitted) ("*Allegheny*"). The test is whether a present controversy exists as to which effective relief may be granted. *Associacao Dos Industriais de Cordoaria E Redes v. United States*, 17 CIT 754, 759, 828 F. Supp. 978, 984 (1993) ("*Cordoaria*").[11] Further, "a case will be dismissed as moot when the challenge presented to the [c]ourt cannot result in meaningful remedy." *Verson v. United States*, 22 CIT 151, 153, 5 F. Supp 2d 963, 966-67 (1998) (internal citations omitted). Here, an actual controversy no longer remains in this case because if Commerce redetermined the SV calculation in Vinh Hoan's favor, such determination would not alter the duty margin; it would still conceptually remain *de minimis*. Thus, "no live case or controversy exists because there is no actual injury that can be redressed by a favorable judicial

---

[11] Relief may exist for controversies that appear moot, but are "capable of repetition, yet evade review." *Cordoaria*, 828 F. Supp at 984. That is not the case here, as this matter is not one that would "evade" review by agency expedient.

decision." *See Verson*, 22 CIT 151 at 154 (internal citations omitted).  Vinh Hoan's arguments are rendered moot because the relief requested would not result in improvement to its margin.

## *Conclusion*

Because the court finds the Remand Results supported by substantial evidence on the record, the results will be sustained and judgment entered accordingly.

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Decided:  March 30, 2016
New York, New York